IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No.  38305-9-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PETRU HOADREA, JR., | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Petru Hoadrea Jr. appeals convictions for second degree assault, harassment, unlawful aiming or discharge of a firearm, and felony assault in violation of a protection order, all arising out of a late morning confrontation with neighbors with whom he was having a boundary dispute.

He asserts confrontation claims that were waived at trial, other issues raised for the first time on appeal, and alleges his trial lawyer provided ineffective assistance of counsel. We affirm the convictions but remand with directions to strike the costs of supervision imposed at subsection 4.2(B)(7) of his judgment and sentence.

FACTS AND PROCEDURAL BACKGROUND

As of mid-May 2020, when Petru Hoadrea committed the offenses in this matter, his once-friendly relationship with his Stevens County neighbors, Jack and Elaine Simmons, had soured. The parties' homes sat on a hill above a pond, and Mr. Hoadrea had built a fence on an allegedly-surveyed property line on their lower property that Mr. Simmons removed after obtaining his own survey, which he recorded. The parties had called the police on each other multiple times. In early 2020, Elaine Simmons had obtained a no-contact order against Mr. Hoadrea. In mid-April of that year, Mr. Hoadrea had been arrested and charged with violating the no-contact order and for theft in the third degree after stealing the Simmonses' fence posts.

At around 11:00 a.m. on May 19, Mr. Hoadrea was sleeping in, having completed a stint in jail, when he woke to the sound of Mr. Simmons driving stakes for a new fence conforming to his recorded survey. Mr. Hoadrea went outside to investigate and saw Mr. Simmons performing the fence work while Ms. Simmons sat on a four-wheeler nearby. Standing on the hilltop above them, Mr. Hoadrea began yelling at them to stop and get off his property. Mr. Simmons did not respond or look up, but Ms. Simmons yelled back that they had a right to be there. Mr. Hoadrea threatened to "fire a warning shot" if they did not leave, after which he fired a shot from a .22 revolver, allegedly in their direction. Rep. of Proc. (RP) at 336.

Ms. Simmons and Mr. Hoadrea both called 911. Stevens County Sheriff's Deputy Travis Feldner responded and spoke with the Simmonses. Based on a brief statement obtained from the Simmonses, Deputy Feldner undertook to obtain a warrant to search Mr. Hoadrea's home, which he and Detective Travis Frizzell assisted Detective J. Coleman Schumacher in executing after the detective also interviewed the Simmonses. The officers seized ammunition and 15 firearms during the search, including the .22 caliber revolver used to fire the warning shot.

Mr. Hoadrea was eventually charged with two counts of assault in the second degree, two counts of harassment, one count of unlawful aiming or discharge of a firearm, and one count of felony assault in violation of a protection order while armed with a firearm.

*Pretrial proceedings and trial*

A month before Mr. Hoadrea's jury trial, the State filed motions in limine in which it sought to offer, as excited utterances and present sense impression, both the recording of Ms. Simmons's 911 call and statements she made to her husband in the moments after the warning shot was fired. The State disclosed in its motion that while Ms. Simmons's unavailability for trial was not required for the hearsay exceptions to apply, she *was* unavailable, as "[she] has had a brain aneurism and . . . is unable to be present or testify at trial due to her physical and mental inability." Clerk's Papers (CP) at 39. At a pretrial hearing, the court and both lawyers agreed that a foundation could likely be laid for

admitting the 911 call and statements to Mr. Simmons under the hearsay exceptions, and they would be admitted subject to a proper foundation. The State had not moved for an order permitting it to offer the statements made by the Simmonses to law enforcement, and the court and counsel agreed at the hearing that the ruling did not go that far.

At trial, Mr. Simmons testified to a couple of things Ms. Simmons said to him immediately following the warning shot: When he turned to her after hearing the shot and asked, "What's this?" she answered, "He shot at you"; and pointed out to him where the bullet had touched ground. RP at 236. Mr. Simmons was asked to identify for jurors the spot she identified using photographs that were in evidence. She pointed to a spot in coarse gravel above where he had been standing. He testified that Ms. Simmons also told him at the time the shot was fired that she was scared. Questioned about her behavior in the weeks following the shooting, he testified that she seemed anxious and took additional precautions around the house, including sleeping with a gun under her pillow.

The recording of Ms. Simmons's 911 call was played for the jury without objection. In relevant part, it captured the following exchanges:

> OPERATOR: . . . What's going on[?]
> CALLER: He came out—we were trying to build our fence. We got it re-surveyed. We've got a copy of the survey—[its] been recorded three times and he just shot at us.
> OPERATOR: What's his name?
> CALLER: Petru Hoadrea.
> . . . .

4

OPERATOR: What is he doing today?

CALLER: We're down here building the (inaudible) fence and he just shot at us.

. . . .

OPERATOR: Okay. —you guys okay?

CALLER: Yeah. He said it was just a warning shot, but shot at us with a .22. He's threatened us before to shoot us, so—.

RP at 301-02.

A recording of Mr. Hoadrea's 911 call was also played for the jury. Mr. Hoadrea did not object. In relevant part, it captured the following exchanges:

OPERATOR: . . . [W]hat is it that you're reporting there today?

CALLER: Jack Simmons was told not to pound his stakes for the fence on my property. He's out there pounding stakes again . . . [a]fter he removed my fence line.

. . . .

CALLER: . . . [T]his is crap because I'm not supposed to talk to them. He's out there yet again. You guys do nothin', the cops do nothing . . . [he] doesn't get off my property and I did fire a warning shot. But he's just out there—pounding away.

RP at 302-03.

After Mr. Simmons testified and Ms. Simmons's and Mr. Hoadrea's recorded 911 calls were played, the prosecutor called Detective Schumacher to testify. She asked him about his interview of Ms. Simmons, but focused on Ms. Simmons's demeanor, not what Ms. Simmons had said. No objection was made until the detective volunteered one of Ms. Simmons's statements:

5

Q    I want to talk specifically about your interview with Ms. Simmons. Now,—when you started talking with her in—how was she—what was her demeanor like.

A    She was generally shook up.  A bit of time had passed since—the initial 9-1-1 'cause we'd driven all the way from Colville, to talk to her and her husband.  But she was animated, she was a bit emotional, her voice was shaky.  I mean, she was definitely nervous about what had happened.  I know she was frustrated because there's been a pattern for the last several years with—the property line and the two neighbors and,—and what-not.

Q    Okay.  Did she come across as upset to you[?]

A    Yes, definitely.

Q    Okay.  Did she come across as not only upset about the past but specifically about what happened that day.

A    She was fairly—she was fairly rattled from that day.

Q    Okay.

A    —worked up, for sure.

Q    Did she come across as scared specifically of Mr. Hoadrea?

A    She told me directly she was.

[DEFENSE COUNSEL]: Objection.

RP at 309-10.

The prosecutor responded to the objection by arguing that Ms. Simmons's statement was an excited utterance.  After a bit more foundation as to the timing, the trial court overruled the objection.[1]

_____

[1] During the next recess, the trial court informed counsel that his ruling on Ms. Simmons's statement to the detective was based on his pretrial review of case law on the excited utterance exception.  He identified several precedents that supported the exception's application to statements made several hours after a startling event.

In renewing her line of questioning, the prosecutor's last question to the detective about his interview of Ms. Simmons dealt only with her demeanor:

Q       So, other than things she's telling you, I guess, did her body—language make you believe that she was in fact fearful of Mr. Hoadrea.

A       She was sitting down.  But she was—I mean,—and granted, some people speak with—with their hands, but her hands were everywhere—she was very animated in what she was telling me.

RP at 310.

Both parties offered considerable evidence about Mr. Hoadrea's gun collection and use of firearms.  During voir dire, the State and defense counsel had quizzed potential jurors about their attitude about firearms, and a number of jurors volunteered the importance to them of their Second Amendment rights.

The State offered pictures of Mr. Hoadrea's guns and ammunition into evidence without objection.  Deputies Feldner and Frizzell testified about the weapons recovered when they searched Mr. Hoadrea's home.  Detective Frizzell stated that most of the firearms were properly stored in a gun safe.

Mr. Hoadrea testified that he was a veteran, range training-qualified, had served as a firearm instructor, and had invested in his firearm collection for 40 years.  He emphasized his attentiveness to firearm safety.  He testified that his warning shot was fired far away from the Simmonses, at a 90-degree angle into a hillside he used as a

7

"target hill," characterizing it as "[n]owhere where the Simmonses were at."  CP at 336, 351.

During closing arguments, defense counsel framed the case as presenting an issue of defense of property and emphasized the Second Amendment implications of the case:

> We talked about the Second Amendment and the right of the people to keep and bear arms and how it shall not be infringed.  And that was—important to a number of members of the panel.  But I would submit to you that this is exactly how the Second Amendment protections are infringed.  This right here is how the state takes away your guns.  You all heard testimony about how this man defended his property, protecting his rights and his home, firing a warning shot . . . [a]nd the state just wants—to come in and take all of his weapons, which he's been collecting for thirty years, and arrest him.

RP at 418.

The jury found Mr. Hoadrea guilty as charged.  The trial court imposed a 104-month sentence.  The court found Mr. Hoadrea indigent, but did not strike boilerplate language in the felony judgment and sentence that imposed costs of supervision as a condition of community custody.  Mr. Hoadrea appeals.

ANALYSIS

Mr. Hoadrea assigns error on appeal to (A) the trial court permitting evidence of testimonial statements by Ms. Simmons in violation of his Sixth Amendment right to confrontation, and alternatively, to his trial lawyer's failure to object in the trial court, which he contends was ineffective assistance of counsel; (B) the trial court permitting the parties to offer "highly prejudicial and irrelevant" photos of firearms, violating his right

to a fair trial, Br. of Appellant at 1; (C) insufficient evidence to support his convictions for harassment; and (D) the trial court imposing costs of supervision despite finding him to be indigent.

We can summarily address Mr. Hoadrea's fourth assignment of error. We have previously rejected the argument that supervision costs are a type of "cost" that cannot be imposed on indigent defendants. *E.g.*, *State v. Geyer*, 19 Wn. App. 2d 321, 332, 496 P.3d 322 (2021); *State v. Spaulding*, 15 Wn. App. 2d 526, 536-37, 476 P.3d 205 (2020). Nevertheless, an intervening change in the law that applies to cases on direct appeal requires that the imposition of costs of supervision be struck, which we will order done. *See State v. Wemhoff*, 24 Wn. App. 2d 198, 200-02, 519 P.3d 297 (2022) (citing SECOND SUBSTITUTE H.B. 1818, 67th Leg., Reg. Sess. (Wash. 2022)).

We address the remaining assignments of error in turn.

I. TRIAL COURT AND ATTORNEY ERROR RE: CONFRONTATION

A. Objection on confrontation grounds was waived

Mr. Hoadrea's first assignment of error is that Ms. Simmons's recorded 911 call and Detective Schumacher's testimony that Ms. Simmons told him she feared Mr. Hoadrea were testimonial, and therefore, given Ms. Simmons's unavailability at trial, they were admissible under the confrontation clause of the Sixth Amendment to the United States Constitution only if he had a prior opportunity for cross-examination, which was not the case. Br. of Appellant at 14 (citing *Davis v. Washington*, 547 U.S.

9

813, 821, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006)). The confrontation clause provides,

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with

the witnesses against him." U.S. CONST. amend. VI.

The State responds that Mr. Hoadrea's confrontation right was waived at trial

when he failed to object to the testimony, relying on the Washington Supreme Court's

2019 decision in *State v. Burns*, 193 Wn.2d 190, 438 P.3d 1183 (2019). While some

Washington decisions had previously held that an objection on confrontation clause

grounds was unpreserved but reviewable if shown to be a manifest error affecting a

constitutional right, *see* RAP 2.5(a)(3), *Burns* held that the failure to object at trial *waived*

the objection: "Where a defendant does not object at trial, 'nothing the trial court does or

fails to do is a denial of the right, and if there is no denial of a right, there is no error by

the trial court, manifest or otherwise, that an appellate court can review.'" 193 Wn.2d at

211 (quoting *State v. Fraser*, 170 Wn. App. 13, 25-26, 282 P.3d 152 (2012)). Mr.

Hoadrea did not object on confrontation grounds at trial, so his right to confront was

waived and there is no "error" to serve as a basis for appeal.

We know from Mr. Hoadrea's supplemental briefing that he believes *Burns* was

incorrectly decided and should be reconsidered. But "reconsidering" *Burns* exceeds our

authority. We are bound to follow majority opinions of our Supreme Court. *State v.*

*Gore*, 101 Wn.2d 481, 487, 681 P.2d 227 (1984).

B.    Ineffective assistance of counsel is not demonstrated

In a supplemental brief that we granted leave for Mr. Hoadrea to file, he reframes the alleged confrontation clause violations as ineffective assistance of his trial lawyer, for failing to object.

The Washington and United States Constitutions guarantee a criminal defendant the right to the effective assistance of counsel. *See* CONST. art. I, § 22; U.S. CONST. amend. XIV, § 1; *see also State v. Sardinia*, 42 Wn. App. 533, 538, 713 P.2d 122 (1986). To demonstrate ineffective assistance, the defendant must show both that trial counsel's representation was deficient and the deficiency prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 117 (2009). To be deficient, representation must fall below an objective standard of reasonableness based on consideration of all the circumstances. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Conduct that can be characterized as "legitimate trial strategy or tactics" cannot serve as the basis for a claim of ineffective assistance of counsel. *State v. Prado*, 144 Wn. App. 227, 248, 181 P.3d 901 (2008). There is a strong presumption that trial counsel's performance was reasonable. *Id.*

Prejudice requires the defendant to demonstrate a "reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been

11

different." *Kyllo*, 166 Wn.2d at 862 (citing *State v. Leavitt*, 111 Wn.2d 66, 72, 758 P.2d 982 (1988)).

A difficulty often faced by an appellant asking us to review an unpreserved confrontation objection as ineffective assistance of counsel is demonstrating that the choice not to object was not tactical. Lawyers commonly refrain from objecting to relevant testimony that is not harmful, lest it appear to jurors that they are trying to hide something. *See, e.g.*, *United States v. Wolf*, 787 F.2d 1094, 1099 (7th Cir. 1986) (common concern that "too-frequent objecting will irritate the jury or make it think the defendant is trying to hide the truth").

No information was established by Ms. Simmons's 911 call that could not be established through Mr. Simmons, and the material content of the call was largely consistent with Mr. Hoadrea's own 911 call and his testimony at trial. Potentially helpful to the defense was that, when asked by the 911 operator "You guys okay?" Ms. Simmons answered, "Yeah," and, "He said it was just a warning shot." RP at 302. In addition to failing to show that his trial lawyer's choice not to object was not tactical, Mr. Hoadrea fails to demonstrate how the admission of the call prejudiced him—proof essential to his ineffective assistance claim.

The other piece of evidence Mr. Hoadrea contends should have been challenged on confrontation grounds was Detective Schumacher's testimony that Ms. Simmons told him she was scared of Mr. Hoadrea. This testimony was offered after Mr. Simmons had

already testified to his wife's non-testimonial expression of fear to him immediately after the shot was fired. Mr. Simmons had also already testified about her anxiety and fearful behavior in the weeks that followed Mr. Hoadrea firing the shot. It appears from the framing of the prosecutor's questions to Detective Schumacher that she sought to elicit his observations of Ms. Simmon's *fearful and agitated demeanor*, not her statement. The testimony about her physical manifestations of fear was not objectionable on confrontation clause grounds.

Defense counsel's failure to object on confrontation grounds to this evidence does not appear to have been tactical, since he did object on hearsay grounds. But here again, in light of other sufficient evidence that Ms. Simmons was placed in reasonable fear by Mr. Hoadrea's shot, no prejudice is shown by the admission of Detective Schumacher's testimony about her statement.

II. PHOTOGRAPHS OF MR. HOADREA'S GUNS DID NOT VIOLATE DUE PROCESS, AND INEFFECTIVE ASSISTANCE OF COUNSEL IN FAILING TO OBJECT TO THEM IS NOT SHOWN

Mr. Hoadrea next contends the trial court erred by permitting the presentation of evidence about Mr. Hoadrea's gun ownership, including photographs of the 15 guns seized in executing the search warrant. He characterizes it as a due process violation. No objection was made by the defense to any of this evidence at trial; indeed, it was elaborated on by the defense. Mr. Hoadrea argues that his trial lawyer's failure to object constituted ineffective assistance of counsel.

13

*Due Process*

We first examine Mr. Hoadrea's invocation of due process. Since no due process objection was made at trial, the error is unpreserved unless he demonstrates manifest constitutional error under RAP 2.5(a)(3). RAP 2.5(a)(3) "serves a gatekeeping function that will bar review of [most] claimed constitutional errors to which no exception was made." *State v. Lamar*, 180 Wn.2d 576, 583, 327 P.3d 46 (2014). To determine whether an error is practical and identifiable (i.e., manifest), an appellate court must place itself in the shoes of the trial court to ascertain whether, given what the trial court knew at the time, the court could have corrected the error. *State v. Kalebaugh*, 183 Wn.2d 578, 584, 355 P.3d 253 (2015) (citing *State v. O'Hara*, 167 Wn.2d 91, 100, 217 P.3d 756 (2009)).

The case law on which Mr. Hoadrea relies does not support his claim of a due process-related error. Two cases on which he relies—*State v. Oughton*, 26 Wn. App. 74, 612 P.2d 812 (1980), and *Moody v. United States*, 376 F.2d 525 (9th Cir. 1967)—make no mention of due process. They were routine appeals of evidentiary rulings on timely objections raised in the trial court.

*Oughton* is a murder case in which a deputy sheriff was permitted to testify, over ER 401 and 403 objections, to the discovery in defendant's car of a knife that the State admitted outside the presence of the jury could not be tied to the charged crime. 26 Wn. App. at 83. Although the appellate court described the knife as "of highly questionable relevance as it tended to impugn defendant's character or suggest the propensity for using

knives as a 'weapon,'" it declined to decide whether the objected-to admission of the knife was reversible error. *Id.* at 84.

*Moody* is a decision in which the appellate court held it had been error, in a narcotics smuggling case, for the district court to overrule an objection to evidence of a loaded revolver and cartridges found in the glovebox of defendant's car and witness testimony that the revolver and cartridges belonged to the defendant. 376 F.2d at 530. The appellate court held that if evidence had been offered that the defendant claimed not to know of the presence of heroin being transported in the car, the revolver might have been relevant on the issue of whether the defendant knew he was engaged in an illegal venture and had the revolver along for that purpose. *Id.* at 531-32. Since that was not the situation presented, however, it held the loaded revolver should not have been admitted. *Id. Oughton* and *Moody* are inapposite to this case, in which no timely evidentiary objection at trial is the basis for appeal.

The only case cited by Mr. Hoadrea that deals with due process is *State v. Rupe*, 101 Wn.2d 664, 703-08, 683 P.2d 571 (1984), in which Rupe challenged the admission of evidence of his gun collection in his death penalty sentencing proceeding. The Washington Supreme Court cited *Zant v. Stephens*, 462 U.S. 862, 885, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983), also a death penalty case, for the proposition that due process is violated if, in such a proceeding, the State draws adverse inferences from the exercise of a constitutional right. *Rupe*, 101 Wn.2d at 705-07. Stated differently, Rupe was "entitled

. . . to possess weapons without incurring the risk that the State would subsequently use the mere fact of possession against him in a criminal trial unrelated to their use." *Id.* at 707.

Mr. Hoadrea's briefing points to nowhere in the record where the State invited the jury to draw an adverse inference from his mere possession of firearms or otherwise used the fact of mere possession against him. He points to no contention by the State that the evidence of his gun possession proved anything more than that he possessed firearms. Possession of a firearm was an essential element of most of the charged crimes and all of the charged enhancements.[2] Not only does Mr. Hoadrea fail to demonstrate any due process error that is manifest; he fails to demonstrate any due process violation at all.

*Ineffective assistance of counsel*

Appellate counsel baldly asserts that "no legitimate strategy or tactic can explain counsel's failure to object to the admission of the photos and testimony about the firearms" because the evidence of firearms beyond the .22 revolver used to fire the warning shot "was unduly prejudicial" and "[t]he sheer number of firearms had great potential for some jury members to view Mr. Hoadrea as a dangerous man." Br. of

---

[2] Mr. Hoadrea was charged, among other offenses, with two counts of second degree assault while armed with a firearm in violation of RCW 9A.36.021(1)(c), one count of unlawful aiming or discharge of a firearm in violation of RCW 9.41.230(1), violation of a protection/no-contact order while armed with a firearm in violation of RCW 26.50.110(4), and three firearm enhancements under RCW 9.94A.533(3).

Appellant at 29-30.  The State's counsel counters that this argument is "culturally tone deaf" given that Stevens County is one of Washington State's "most conservative, remote, and pro-gun counties."  Resp't's Br. at 10, 22.

It is reasonable in assessing a dispute over tactical strategy that turns on prevailing attitudes in Stevens County to take judicial notice that it is a rural county, in which only 9.400 percent of the population lives within its six incorporated cities.[3]  It is reasonable to take further judicial notice that it is, as the State argues, demonstrably one of the State's most politically conservative counties.  Even more to the point, the voir dire, which was transcribed, supports the State's argument that there was a tactical basis for a Second Amendment-themed defense and undercuts Mr. Hoadrea's argument that there was no tactical basis for counsel's actions.  During voir dire, the State asked if any of the potential jurors had strong feelings about firearms.  Seven jurors volunteered that they were gun owners and cared deeply about the Second Amendment to the United States Constitution.  One juror admitted to being a nongun owner and to being "very sad" about the amount of gun violence happening in the country but stated, "I understand [that in] Stevens County everyone has one.  I get it.  Hunting's a fine thing."  RP at 169.  Defense counsel later followed up on the State's question and commented that "it seemed pretty

---

[3] *See About Stevens County*, STEVENS COUNTY, WASH., https://www.stevenscountywa.gov/pview.aspx?id=449&catid=29 (last visited Apr. 28, 2023).

clear that most people in this room are in favor of having their rights to their firearms, and using those firearms." RP at 183.

Mr. Hoadrea fails to demonstrate that his trial lawyer's choice not to object to the evidence of his firearm ownership was not legitimate trial strategy.

III.     SUFFICIENCY OF THE EVIDENCE TO PROVE THE HARASSMENT CHARGES

Mr. Hoadrea's final assignment of error is that the evidence was insufficient to prove him guilty of the harassment charges. The jury was instructed that with respect to the charges for harassment of Mr. and Ms. Simmons, four elements must be proved beyond a reasonable doubt:

1.      That on or about May 19, 2020, the defendant knowingly threatened:

   a.      To cause bodily injury immediately or in the future to Jack[/Elaine] Simmons, or

   b.      maliciously to do any act which was intended to substantially harm Jack[/Elaine] Simmons with respect to his[/her] physical health or safety;

2.      That the words or conduct of the defendant placed Jack[/Elaine] Simmons in reasonable fear that the threat would be carried out;

3.      That the defendant acted without lawful authority; and

4.      That this act occurred in the State of Washington.

CP at 71-72.

"In claiming insufficient evidence, the defendant necessarily admits the truth of the State's evidence and all reasonable inferences that can be drawn from it." *State v. Homan*, 181 Wn.2d 102, 106, 330 P.3d 182 (2014). Circumstantial and direct evidence

18

are considered equally reliable. *State v. Thomas*, 150 Wn.2d 821, 874, 83 P.3d 970 (2004), *aff'd*, 166 Wn.2d 380, 208 P.3d 1107 (2009). The standard of review for determining the sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Hampton*, 143 Wn.2d 789, 792, 24 P.3d 1035 (2001).

Mr. Hoadrea's challenge to his conviction for harassment of Elaine Simmons is based on his contention that the only evidence of her reasonable fear was inadmissible as violating the confrontation clause. We have already rejected that contention and identified the sufficient admissible evidence of Ms. Simmons's reasonable fear that was offered through Mr. Simmons and the observations of Detective Schumacher.

Mr. Hoadrea's challenge to his conviction for harassment of Jack Simmons also focuses on the required element that the person threatened must experience reasonable fear that the threat will be carried out. He argues that the State presented no evidence from which the jury could find that element proved as to Mr. Simmons.

When asked "[W]ere you scared when—when the shot went off," Mr. Simmons answered, "No, because I've . . . been shot at before. If he'd have hit me then I'd have been damn scared, but I was . . . scared of the ricochet. Who knows where . . . a ricochet will go[?]" RP at 239-40. He also testified, however, that following the "warning shot" incident, he began carrying his gun with him whenever he went near the disputed

19

property line, which the prosecutor argued in closing was the relevant evidence demonstrating his fear from the threat that was implicit in the "warning shot." He also referred to his position at the time of the shooting as that of a "sitting duck." RP at 249.

Jurors knew from Mr. Simmons's background testimony that he had lived on and worked a ranch from 1976 until selling it in 2018. They could infer from his background and demeanor that he would not lightly admit to being afraid. The jury was properly instructed that "circumstantial evidence" is "evidence from which, based on your common sense and experience, you may reasonably infer something that is at issue in this case." CP at 60; *accord State v. Jackson*, 145 Wn. App. 814, 818, 187 P.3d 321 (2008). They could infer from their common sense and experience that having a "warning shot" fired in one's direction would be fear inducing for most people.

We trust jurors to infer whether a victim was placed in "reasonable fear" with the victim's characteristics in mind. Some victims will be completely forthcoming about their fear, while others will make only limited or qualified admissions and perhaps reveal fear mostly through their actions. Taken together, Mr. Simmons's testimony, the evidence of his actions, and the inferences that can be drawn from the fact that a .22 caliber revolver was shot in his direction, is sufficient.

STATEMENT OF ADDITIONAL GROUNDS

In a pro se statement of additional grounds (SAG), Mr. Hoadrea raises four.

20

*SAG 1: Mr. Simmons's trial testimony was not based on his personal perception, but solely on hearsay, and counsel's failure to object was ineffective assistance of counsel*

Mr. Hoadrea argues that according to the probable cause statement, Mr. Simmons told responding officers that he did not hear a shot because he was pounding stakes for the fence, but at trial Mr. Simmons stated he *did* hear the shot. He argues that Mr. Simmons's trial testimony that he heard the shot must have been based on his wife's observations and was therefore impermissible hearsay. He argues that his trial lawyer performed ineffectively by failing to object on this basis.

Mr. Hoadrea's argument is based on a misreading of the declaration of probable cause. The reports from Deputy Feldner and Detective Schumacher attached to the declaration of probable cause do not state that Mr. Simmons denied hearing the shot. Moreover, if the deputies misunderstood Mr. Simmons in preparing their reports, he would still be expected to testify to what he *actually* saw and heard at trial. At trial, he testified that although he did not see the gun, he heard Mr. Hoadrea yelling, and he heard when the shot was fired. The probable cause statement does not conflict with Mr. Simmons's trial testimony so there was no basis on which to object.

*SAG 2: The State violated Mr. Hoadrea's right to a fair trial by bringing up his custodial status*

Mr. Hoadrea next contends that the State "violated my right to a fair trial" by bringing to jurors' attention that he had been in jail prior to the shooting. SAG at 5. The

authority on which he relies, however, addresses appellate review of timely evidentiary objections (*State v. Hardy*, 133 Wn.2d 701, 706, 946 P.2d 1175 (1997)) or, where no objection was made, review of a claim of ineffective assistance of counsel (*State v. Vazquez*, 198 Wn.2d 239, 247-48, 494 P.3d 424 (2021)). Washington cases hold that for jurors to hear that a defendant was in jail does not, on its own, violate the right to a fair trial. *State v. Mullin-Coston*, 115 Wn. App. 679, 694, 64 P.3d 40 (2003), *aff'd*, 152 Wn.2d 107, 95 P.3d 321 (2004). ER 609, which Mr. Hoadrea touches on, is not at issue; he was not questioned about prior convictions (he had none).

Mr. Hoadrea points out that his jail time served prior to the offense conduct on May 19 was first raised by Mr. Simmons, the State's first witness. In answering a question about the history of the parties' dispute, Mr. Simmons stated in passing, "Mr. Petru—whatever you call him, got bailed out of jail when I was about half done with [the fence] . . . ." RP at 225. The defense did not object. Mr. Hoadrea complains that the prosecutor later implied that *Mr. Hoadrea* brought up the fact of the recent jail time, an "implication [that] is untrue," when she asked, "[Y]ou had mentioned this, that you were getting out of jail. That's what you went to jail for, was this altercation with these two— these surveyors?" SAG at 6 (quoting RP at 344). The defense did not object to the prosecutor's question.

Mr. Hoadrea *had* brought up his release from jail when he was questioned about the events of May 19. His testimony appears in the transcript 10 pages before the prosecutor's question:

> Q    When—What happened when Mr. Simmons started building his fence.
>
> . . . .
>
> A    I have no idea when he started building his fence because I was in jail—
>
> Q    Okay.
>
> A    When I returned home and I went to bed because I couldn't sleep at all in jail, I got woken up by like—pounding,—metal pounding, and —on my property[.]—The way that it is because of the—(inaudible) is amplified. So it woke me up. I came out to investigate, what this pounding was. And then—I saw—two people building a fence on my property.

RP at 334.

Also germane to this issue is the pretrial discussion and ruling on the State's fifth motion in limine, which sought the court's permission to offer historical background on the protection order, the surveys, and the competing fence construction. The State conceded that some of it "may be considered [ER] 404(b) evidence," but it was admissible for the permissible purpose of explaining the friction between the parties and the Simmonses' reasonable fear. CP at 41. At the hearing on the motion, even defense counsel stated:

> [T]he state and I are each prepared to have witnesses testify to a degree about prior incidences between the Simmonses and the defendant because

> otherwise the incident that is alleged to have taken place will have no context and will make no sense. . . . And I understand what the state is seeking to allow Mr. Simmons to testify about. And we had talked a little . . . about how we're certainly not going to be getting into character evidence in conformity with one witness and not another.

RP at 109-10.

The trial court granted the State's motion to offer testimony from Mr. Simmons "to prior incidences with the defendant," CP at 44, and essentially reserved ruling on the broader issue discussed at the hearing, observing that "I don't want to preclude the parties from putting on the case that they believe is their best case," and "[I]f there's some objection that . . . we're getting beyond where we need to go, . . . then we'll deal with it." RP at 112.

Not having objected at trial to Mr. Simmons's testimony or the prosecutor's questioning of Mr. Hoadrea, Mr. Hoadrea must rely on a claim of ineffective assistance of counsel. Yet he only conclusorily addresses the twin prongs of such a claim, stating "[t]here is no tactical reason for my counsel to not object, and . . . as a result, there is reasonable probability that the result of the trial would be different." SAG at 7. A choice not to draw attention to fleeting mention of evidence that is not particularly damaging is a classic and legitimate tactical reason for not objecting, however. *E.g.*, *State v. Gladden*, 116 Wn. App. 561, 567-68, 66 P.3d 1095 (2003) (defense counsel did not object to witness statement about defendant moving "when he got out of prison"). Mr. Hoadrea does not demonstrate ineffective assistance of counsel.

24

*SAG 3:  The trial judge should have recused himself*

Mr. Hoadrea next complains that Judge Lech Radzimski had presided over a separate civil trial between the Simmonses and himself, resulting in "a high probability of prejudice and bias against me."  SAG at 7.  He also notes that Judge Radzimski not only presided at trial but was the sentencing judge, and asks, "Is it not standard practice to use different judges for trial & sentencing?"  *Id.*  The answer to this latter query is "no"; it is the norm for the trial judge to serve as sentencing judge, although it is not constitutionally or statutorily required.  *See, e.g.*, *State v. Sims*, 67 Wn. App. 50, 56, 834 P.2d 78 (1992) (citing RCW 2.28.030(2)).

The doctrine of waiver applies to bias and appearance of fairness claims.  *State v. Morgensen*, 148 Wn. App. 81, 91, 197 P.3d 715 (2008) (citing *State v. Bolton*, 23 Wn. App. 708, 714, 598 P.2d 734 (1979); *In re Welfare of Carpenter*, 21 Wn. App. 814, 820, 587 P.2d 588 (1978)).  Mr. Hoadrea would have been entitled to a different judge upon filing a timely notice of disqualification, but he did not file one.  *See* RCW 4.12.050(1)(a) and CrR 8.9.  Although it would not avoid his waiver of the issue, we also observe that Mr. Hoadrea has not supported his claim with evidence of any actual prejudice.

*SAG 4:  Ineffective assistance for failure to object*

Finally, Mr. Hoadrea argues that trial counsel performed ineffectively by failing to object in "numerous situations."  SAG at 8.  Only two occurrences are identified,

however.  *See* RAP 10.10(c) (SAG must inform us, at a minimum, of the nature and occurrence of alleged errors; we are not obligated to search the record).

The two failures to object that Mr. Hoadrea identifies are his trial lawyer's failure to object when Mr. Simmons mentioned Mr. Hoadrea's getting bailed out of jail, and the prosecutor bringing up his being in jail and questioning him about the reasons why.  As previously addressed, it was a legitimate tactical choice not to draw attention to these fleeting references to information that was not very damaging.

We affirm the convictions but remand with directions to strike the costs of supervision imposed at subsection 4.2(B)(7) of Mr. Hoadrea's judgment and sentence.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Pennell, J.

_____
Staab, J.

26